UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DANIEL EASLER, | ) | 1:19-CR-00049-LEW |
| | ) | |
| Defendant | ) | |

## DECISION AND ORDER ON
## DEFENDANT'S MOTION TO SUPPRESS

Defendant Daniel Easler is indicted as a felon in possession of firearms and ammunition in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Indictment (ECF No. 5). Easler moves to suppress evidence gathered from his person on the night of December 4, 2018. Mot. Suppress 1 (ECF No. 26). A hearing on the motion was held on June 24, 2019. After careful consideration of the evidence and the arguments of counsel, Defendant's motion to suppress is **DENIED**.

## BACKGROUND

On the evening of December 4, 2018, the Caribou Police Department received a call from a citizen who reported witnessing a GMC pickup suddenly veer off the road and into a snow bank. The citizen indicated that when he pulled over to assist, the driver (who was later identified as Defendant Easler) approached his car and asked for a ride, saying: "I need to get out of here." Because Easler was "acting odd" and "something seemed off," the citizen declined to give Easler a ride. Easler went back to his truck and the citizen (who remained at the scene) did not see him again.

Eric Depner, an officer with the Caribou Police Department, arrived at the scene approximately 15 minutes later and observed the GMC pickup stuck in a snowbank, but was unable to locate Easler. Officer Depner then identified a fresh set of footprints in the snow and followed the footprints past a nearby apartment building, into the surrounding woods, and then through a potato field. When his flashlight malfunctioned, Officer Depner called for backup and returned to the GMC pickup. Officer Depner reported that it was extremely cold that evening.

Sergeant Keith Ouellette[1] arrived on the scene and while Officer Depner directed traffic near the GMC pickup, Sergeant Ouellette followed the footprints. Based on the trajectory of the footprints, Sergeant Ouellette directed Officer Depner to an area where he anticipated Easler may be located. Officer Depner drove his police cruiser to the general area indicated by Sergeant Ouellette, got out of his cruiser, and found Easler lying face down in the snow with his hands above his head. Officer Depner instructed Easler to his feet. After Easler stood up, Officer Depner observed a shotgun on Easler's person hanging from a sling. Officer Depner drew his gun, directed Easler to the roadway, ordered him to the ground, and updated dispatch. Officer Depner noted that Easler matched the description provided by the citizen.

Officer Ouellette and Officer Gerard Lemoine arrived on the scene, secured Easler by handcuffing him, and then searched him. In addition to the loaded pump-action shotgun visible on Easler's body, this search revealed a loaded Highpoint brand 9-mm handgun, a drug kit, a clear bag which the officers believed contained methamphetamine, a set of

---

[1] Sergeant Ouellette was an officer at the time of this interaction.

handcuffs, and a methamphetamine pipe.  At all times Easler refused to identify himself.  The officers formally arrested Easler and brought him to the police station.

At the police station, Easler continued to refuse to identify himself.  Police officers then used a fingerprint scanner and identified him as Daniel Easler.  During this identification process, the officers learned that Easler was a felon whose driver's license had been revoked and who had several outstanding warrants and sets of bail conditions.  Officers also learned that the handgun discovered on Easler's person had been reported as stolen.

**DISCUSSION**

In support of his motion to suppress Easler advances two arguments.  First, he argues that the officers did not have a "reasonable, articulable suspicion of criminal activity at the time of the search" as required by the Fourth Amendment.  Mot. Suppress, ¶ 7.  Second, he asserts that even if the stop was initially lawful and officers could articulate a reasonable suspicion of criminal activity, the stop nevertheless evolved into a de facto arrest unsupported by probable cause, as evidenced by "the method and circumstances of the detention . . . at the time of the search and seizure."  *Id.* ¶ 8, 10-11.  I will address each argument in turn.

**I.**     *TERRY* **STOPS**

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. CONST. amend. IV.  When an officer temporarily detains an individual, they effectuate a "seizure" that necessarily implicates the Fourth Amendment.  *United States v. Romain*, 393

F.3d 63, 70-71 (1st Cir. 2004). However, a temporary detention, also known as a "*Terry* stop," is not violative of a defendant's constitutional rights if the stop is "based on a reasonable suspicion that criminal activity may be afoot." *United States v. Rabbia*, 699 F.3d 85, 89 (1st Cir. 2012); *see also Terry v. Ohio*, 392 U.S. 1, 22 (1968) ("[A] a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest."). When evaluating a *Terry* stop, courts consider whether an officer reasonably suspected criminal activity before engaging with the individual – in other words, whether the stop was "justified at its inception" – and whether, as the stop progressed, the officer's actions were "reasonably related in scope to the circumstances which justified the interference." *United States v. Pontoo*, 666 F.3d 20, 26 (1st Cir. 2011) (quoting *United States v. Acosta–Colon*, 157 F.3d 9, 14 (1st Cir. 1998)).

> A. **Reasonable Suspicion**

The lynchpin of the first inquiry, reasonable articulable suspicion, requires "more than a naked hunch that a particular person may be engaged in some illicit activity," but yet "does not require either probable cause or evidence of a direct connection linking the suspect to the suspected crime." *United States v. Chhien*, 266 F.3d 1, 6 (1st Cir. 2001); *see also United States v. Sokolow*, 490 U.S. 1, 7 (1989) ("The officer, of course, must be able to articulate something more than an 'inchoate and unparticularized suspicion or hunch.'" (quoting *Terry*, 392 U.S. at 27)). In addition to an officer's own observations, information provided by onlookers may form the basis of reasonable suspicion if "the information carrie[s] enough indicia of reliability." *Adams v. Williams*, 407 U.S. 143, 147 (1972).

4

Whether an officer's suspicions are based on his or her observations, information provided by a third party, or some combination thereof, courts assess the reasonableness of the officer's suspicions through "broad-based consideration of all the attendant circumstances." *Chhien*, 266 F.3d at 6 (citing *Florida v. Royer*, 460 U.S. 491, 500 (1983)).

Easler asserts that while his behavior may be "considered by some to be odd," none of his actions – which he characterizes as "[m]oving one's vehicle to the side of a roadway," "walking through the woods and into a field," and "openly carrying a firearm" – are, in themselves, criminal activities. Mot. Suppress ¶ 7. Ultimately, he argues that because "it is impossible to distinguish from the reports what crime the police were investigating and the police never indicated what criminal activity they suspected in their reports prior to the search," the responding officers are somehow foreclosed from articulating a reasonable suspicion of criminal activity to justify this *Terry* stop. *Id.* Easler's argument misconstrues both the legal standard and the record.

To withstand constitutional scrutiny, officers need not accurately point to a specific crime before conducting a *Terry* stop. *See Pontoo,* 666 F.3d at 28 ("In carrying out a *Terry* stop, a police officer is not required to possess the clarity of vision that arises only in hindsight."); *see also United States v. Guardado*, 699 F.3d 1220, 1224 (10th Cir. 2012) ("*Terry* demands suspicion not certainty"); *United States v. Bonilla*, 357 F. App'x 693, 703 (6th Cir. 2009) ("It is well-settled that reasonable suspicion that 'criminal activity may be afoot' does not require suspicion of a specific crime, but rather criminal activity in general." (quoting *Terry*, 392 U.S. at 30)). Instead, the standard requires only a "particularized and objective basis for suspecting the person stopped of criminal activity, rooted firmly 'in

5

specific and articulable facts.'" *United States v. Brake*, 666 F.3d 800, 804 (1st Cir. 2011) (quoting *Pontoo*, 666 F.3d at 28); *see also United States v. Pack*, 612 F.3d 341, 356 (5th Cir.), *opinion modified on denial of reh'g*, 622 F.3d 383 (5th Cir. 2010) ("While the [Supreme] Court clearly requires the police to be able to articulate a 'particularized . . . basis' for suspecting wrongdoing, it has often spoken of the wrongdoing itself in general terms. . . . Requiring police to have particularized facts that support a finding that 'criminal activity may be afoot' is different from requiring the police to articulate particularized facts that support a finding that a particular specific crime is afoot" (citations omitted)).

When viewed holistically, the circumstances of the day could certainly lead a reasonably prudent officer to suspect criminal activity. Prior to any direct interaction with Easler, a sufficiently reliable source[2] informed officers that Easler's vehicle had "suddenly" drifted off the road and come to a stop upon a snowbank and then Easler had demanded help in ineluctably suspicious terms: "I need to get out of here." This third-party emphasized that Easler had acted "odd" when asking for a ride and then, once his demand was denied, disappeared from the scene. *See Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("Our cases have also recognized that nervous, evasive behavior is a pertinent factor in determining reasonable suspicion. Headlong flight – wherever it occurs – is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly

---

[2] The citizen's report demonstrated sufficient indicia of reliability as the citizen identified himself, sought immediate police assistance, contemporaneously notified the police of what he personally observed, remained at the scene and participated in further discussion with the police, and provided an accurate description of Easler. *See, e.g., Adams*, 407 U.S. at 146-47 (relying on a similar set of considerations as "enough indicia of reliability"); *see also United States v. Aviles-Vega*, 783 F.3d 69, 75 (1st Cir. 2015) (finding that an anonymous caller's tip was sufficiently reliable due to "the eyewitness basis of knowledge and the contemporaneous nature of the tip"). Importantly, the citizen's report was corroborated by the police officers' own observations, especially regarding Easler's apparent desire to flee the scene.

suggestive of such." (internal citations omitted)). Easler was then found in a nearby field lying on the ground, in the snow, with a shotgun clearly visible on his person. Although none of Easler's actions, standing alone, may have been obviously criminal, the citizen's description of Easler's demeanor coupled with Easler's erratic, evasive, and – to coin the phrase utilized by the *Terry* Court – "unusual" conduct throughout the evening nevertheless provided a sufficient factual basis to support the officers' suspicion of criminal activity. *See, e.g., Terry*, 392 U.S. at 30 (permitting a *Terry* stop when "a police officer observes *unusual conduct* which leads him reasonably to conclude in light of his experience that criminal activity may be afoot" (emphasis added)); *see also Wardlow*, 528 U.S. at 125-26 (noting that even when a defendant's suspicious conduct is "by itself lawful," *Terry* permits law enforcement officers to conduct a *Terry* stop to "resolve the ambiguity" and "briefly investigate further").

Contrary to Defendant's assertions, a reasonable articulable suspicion is not undermined by alternative theories for unusual conduct, however plausible those theories might be. *See, e.g., Wardlow*, 528 U.S. at 125-26. In other words, it is always possible that the basis for an officer's suspicion may be dispelled upon further investigation but that does not, standing alone, undermine the constitutional propriety of the stop in the first instance. However, in this case, nothing was discovered upon further investigation that dispelled the basis for the stop or called into question its scope. As in most of life, context matters. Atomized into its component parts and blinkered to all of the other component parts, Easler argues that it is his prerogative to park his truck on a snowbank, express his urgent desire to "get out of here," and to walk through the fields and woods at night in near

zero-degree temperatures. It is, likewise, his right to open carry while sojourning through the lustrous winter wonderland of an Aroostook County night to lie in repose in a field on a fresh bed of snow. However, when those expressions of individual liberty are quilted together, the tapestry reveals that the law enforcement officers' suspicion was based on something far north of a hunch. The stop was justified as having been based on a reasonable articulable suspicion.

### B. Scope of the Stop

When police subject an individual to a *Terry* stop based on a reasonable suspicion of criminal activity, the extent of the officer's intrusion is necessarily limited. *Pontoo*, 666 F.3d at 30. If, as the stop progresses, the officer utilizes means that are "too intrusive in nature or too long in duration," then the officer's actions no longer "reasonably relate[] in scope to the circumstances which justified the interference" and the stop may be transformed from "a valid *Terry* stop" into "its invalid counterpart (commonly known as a de facto arrest)." *Id.* at 26, 30 (citations and quotation marks omitted); *see also Royer*, 460 U.S. at 500 ("The scope of the detention must be carefully tailored to its underlying justification. . . . [A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time.").

As stated by the First Circuit, "[t]here is no 'litmus-paper test' . . . to determine whether any particular mode of detention amounted to a *de facto* arrest." *Acosta-Colon*, 157 F.3d at 14 (quoting *Royer*, 460 U.S. at 506). As with reasonable suspicion, courts

8

evaluating the scope of a stop look to the totality of the circumstances and consider a variety of factors. *United States v. Sowers*, 136 F.3d 24, 28 (1st Cir. 1998). In practice, this multifactorial inquiry is commonly reduced to one core consideration: "whether 'a reasonable man in the suspect's position would have understood his situation' . . . to be tantamount to being under arrest." *United States v. Zapata*, 18 F.3d 971, 975 (1st Cir. 1994) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984)). However, it is important to note:

> Where an investigatory stop is justified at its inception, it will generally not morph into a de facto arrest as long as "the actions undertaken by the officer[s] following the stop were reasonably responsive to the circumstances justifying the stop in the first place as augmented by information gleaned by the officer[s] during the stop."

*United States v. Chaney*, 647 F.3d 401, 409 (1st Cir. 2011) (quoting *United States v. Trueber,* 238 F.3d 79, 92 (1st Cir. 2001).

Easler argues that even if officers could have reasonably suspected him of engaging in criminal conduct, by handcuffing him and then searching him the officers escalated the interaction beyond the level of a *Terry* stop to that of a "de facto arrest" unsupported by probable cause.[3] Mot. Suppress ¶¶ 10, 11. Therefore, he argues, the search was unlawful and I must suppress the evidence gathered from his person. *Id.* ¶ 11. Contrary to Easler's assertions, this is not a case where the investigatory stop "mutate[d] into the functional equivalent of an arrest." *United States v. Lee*, 317 F.3d 26, 31 (1st Cir. 2003).

---

[3] When police subject an individual to a "temporary detention," that detention, as discussed above, must be based upon a "showing equivalent to reasonable suspicion." *Morelli v. Webster*, 552 F.3d 12, 19 (1st Cir. 2009). However, if the interaction at issue transforms into an arrest or *de facto* arrest, the government must shoulder the "qualitatively different" and more stringent burden of establishing probable cause. *Id.*

9

It is a bedrock principle that "'[w]hen an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others,' he may conduct a limited protective search for concealed weapons." *Adams*, 407 U.S. at 146 (quoting *Terry*, 392 U.S. at 24); *see also Romain*, 393 F.3d at 71 ("[I]n determining whether a pat-down search is an appropriate step following a valid *Terry* stop, the key is whether, under the circumstances, 'the officer is justified in believing that the person is armed and dangerous to the officer or others.'" (quoting *United States v. Schiavo*, 29 F.3d 6, 8 (1st Cir.1994))). Easler – a suspect who had reportedly been "acting oddly," fled his vehicle, was discovered lying on the ground in a snowy field at night in zero-degree temperatures, and was armed with an exposed shotgun clearly posed a substantial degree of risk to the officers. The officers' search of Easler's body was eminently appropriate.

These same circumstances also guide my determination that the officers' decision to handcuff Easler was both reasonable and appropriate. While it is true that "the use of handcuffs, being one of the most recognizable indicia of a traditional arrest, 'substantially aggravates the intrusiveness' of a putative *Terry* stop," it is also clear that officers may handcuff a suspect when "the use of such restraints [is] necessary to carry out the legitimate purposes of the stop without exposing law enforcement officers, the public, or the suspect himself to an undue risk of harm." *Acosta-Colon*, 157 F.3d at 19; *see also Pontoo*, 666 F.3d at 30 ("When officer safety is a legitimate concern, a *Terry* stop appropriately may involve the application of handcuffs."). This is the paradigmatic scenario supporting the application of handcuffs while conducting a Terry stop. Easler roamed away from his truck

left atop a snowbank, after requesting transportation because he had to "get out of here." He was found in a field of snow on a cold night with a pistol-grip shotgun hanging from a sling in plain view. The officers' actions, although plainly restrictive, were both proportional and reasonably responsive to the potential danger they faced which did not transform this *Terry* stop into a de facto arrest before the officers uncovered the evidence Easler seeks to suppress.[4]

## CONCLUSION

For the foregoing reasons, Defendant's Motion to Suppress (ECF No. 26) is **DENIED.**

**SO ORDERED.**

Dated this 1st day of July, 2019

/s/ Lance E. Walker
**LANCE E. WALKER**
**UNITED STATES DISTRICT JUDGE**

---

[4] Easler concedes that once the officers searched his person, they had probable cause to arrest him. Mot. Suppress ¶ 12. I agree. The officers' lawful search revealed "enough evidence to warrant an arrest": a second loaded firearm, a drug kit, a clear bag which the officers believed contained methamphetamine, a set of handcuffs, and a methamphetamine pipe. *See United States v. Quinn*, 815 F.2d 153, 161 (1st Cir. 1987); *see also United States v. Rasberry*, 882 F.3d 241, 249-50 (1st Cir.), *cert. denied*, 139 S. Ct. 591 (2018) ("It is common ground that a *Terry* stop can evolve to a point at which there is probable cause to make an arrest.").

11